UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-61903-COHN/SELTZER

JAMES FALIN, individually and as
Attorney-in-Fact for ANTOINETTE FALIN,

    Plaintiff,

v.

CONDOMINIUM ASSOCIATION OF
LA MER ESTATES, INC. and KEVIN RATHVON,

    Defendants.
_____/

## DEFENDANTS' MOTION TO STRIKE "EXPERT" WITNESS JOAN ESNAYRA AND MOTION TO COMPEL ANSWERS TO DEPOSITION QUESTIONS

Defendants, Condominium Association of La Mer Estates. Inc. and Kevin Rathvon, move this Court to Strike Joan Esnayra from Plaintiff's witness list and preclude her testimony, and otherwise to compel her to respond to certain deposition questions and in support state:

### I. Summary of Argument

Ms. Esnayra should be excluded from the Plaintiff's witness list and precluded from testifying because she has willfully violated Rule 26 and is not qualified to render medical opinions. Also, Ms. Esnayra's proposed opinions are unreliable and not supported by peer reviewed data, the methods and procedures of science, or the facts of the case.

### II. Relevant Background

Plaintiff, James Falin, contends that he has somehow suffered hundreds of thousands of dollars in damages because his mother, Antionette Falin's, application was denied by Defendant, La Mer Condominium, in accordance with its no pets rule.

The entire foundation of Mr. Falin's case rests upon a letter that was signed by Ms. Falin's treating physician Dr. Maxine Hamilton. *See* **Exhibit A** at Exhibit 1. Dr. Hamilton states in her letter, *inter alia*, that she "previously prescribed" a service dog to Ms. Falin for the recognition of "the onset of seizure." *Id*. Dr. Hamilton also states in her letter that she had been treating Ms. Falin since "June of 2006" and that she was "familiar with the voluminous literature concerning the therapeutic benefits of assistance animals for people with disabilities such as those experienced by Antonette. If need be I will provide citations to relevant studies …" *Id*.

When examined under oath, Dr. Hamilton admitted that her letter was a fraud. Dr. Hamilton is not familiar with any of the literature concerning service animals and falsely stated so. *See* Hamilton at p. 41, l. 1 – p 42, l. 11. Dr. Hamilton falsely doubled the period of time that she has been treating Ms. Falin. *See* Hamilton at p. 38. Dr. Hamilton never prescribed any sort of animal therapy for Ms. Falin, and falsely stated so in her letter. *See* Hamilton at p. 37, l. 5-7 and p. 38, l. 18-25. As a compassionate physician, she simply signed the letter at Mr. Falin's request to try to help her patient keep her pet that she loved and needed just like any elderly person loves and needs a pet they have owned for nearly 10 years. Thus, Dr. Hamilton's testimony establishes that this case is nothing more than an ill-conceived fraud on the Court.

Not surprisingly, the letter signed by Dr. Hamilton is based upon **<u>a form</u>** that is available on a website maintained by lawyers seeking to represent plaintiffs in this type of lawsuit – the Bazelon Center. *See* Deposition of Dr. Hamilton at Exhibit 2. Beyond the obvious problem with the use of a form letter, it was also discovered that Ms. Esnayra was hired by the Bazelon Center. *See* p. 3, *infra*.

Without the medical testimony needed to substantiate his claim, Mr. Falin engaged Joan Esnayra to provide "expert" testimony on issues concerning medical treatment. The fundamental

problem is that Ms. Esnayra is not a medical doctor, or medical professional of any kind. Ms. Esnayra merely holds a bachelor of arts in philosophy and a Ph.D. in Biology. *See* Deposition of Joan Esnayra, attached hereto as **Exhibit B,** at 35-36. She runs an organization that advocates on behalf of people with pet access issues. *See* Esnayra at 22-23. The substance of Ms. Esnayra's deposition, as well as her evasiveness and failure to answer simple questions, precipitated the filing of this motion.

### III. Argument

**A. The Court Should Strike Ms. Esnayra as a Witness for Her Willful and Material Failure to Comply With Rule 26**

The Court should strike Ms. Esnayra as a witness in this matter for her willful and material failure to comply with Federal Rule of Civil Procedure 26 by (1) failing to disclose significant prior testimony in her disclosure, and (2) failing to properly describe documents she purportedly reviewed in reaching her opinion.

**1. Failure to Disclose Prior Testimony for Bazelon Center**

Rule 26(2)(B)(v) requires the disclosure of prior expert witness testimony. This requirement is to "allow opposing counsel to review an expert's past testimony, [and], the purpose of the Rule 26 expert disclosures more generally 'is to prevent unfair surprise at trial and to permit the opposing party ... to depose the expert, and to prepare for depositions and cross-examination at trial.'" *Jennings v. Thompson*, 792 F.Supp.2d 1, 6 (D.D.C. 2011)

Section IV of Ms. Esnayra's report fails to disclose that she recently testified in a strikingly similar case involving a service dog. She was hired by the Bazelon Center, the same organization that provided the form letter fraudulently signed by Dr. Hamilton. *See* Deposition of Esnayra at p. 8. Given that Ms. Esnayra has only acted as an expert in three cases, it is highly

unlikely that this omission was an oversight. "If a party fails to follow the disclosure requirements of Rule 26, the court can prevent the expert from testifying unless the failure to disclose is harmless or substantially justified." *Jennings*, 792 F.Supp.2d at 6. Here, the failure was neither harmless nor justified, but was designed to conceal Ms. Esnayra's direct connection to the author of the internet form letter upon which Mr. Falin drafted Dr. Hamilton's fraudulent letter.

As such, Ms. Esnayra should be stricken as a witness in this matter.

**2. Failure to Identify Documents Reviewed.**

Rule 26(2)(B)(ii) requires the expert's report to contain the facts and data considered by the expert. Section III of Ms. Esnayra's report states that she considered "some of Ms. Falin's case documents." *See* **Exhibit C**. She fails to identify any of these documents. She was also unable or unwilling to identify these documents in her deposition. Fundamental fairness dictates that La Mer should be given the opportunity to cross examine the witness on the case documents that she has (and has not) reviewed. Indeed, Ms. Esnayra's refusal to identify what she has reviewed has deprives La Mer of this most basic information, and makes it impossible to examine her.

As such, Ms. Esnayra should be stricken as a witness in this matter.

**B. Ms. Esnayra's is Not a Medical Doctor, or Mental Health Professional, and Should Not be Permitted to Render Opinions that Require Medical Expertise**

Mr. Falin's case is devoid of the medical testimony needed to meet his burden. Mr. Falin was unable to secure an actual expert in the field because the scientific basis for the subject testimony is lacking. Mr. Falin now desperately seeks to have Ms. Ensyara provide this testimony. She is completely unqualified, however, to render opinion testimony based in medicine or medical intervention.

**1. Description of Qualifications – Suffering from Psychological Maladies Does Not Qualify Ms. Esnayra to Render Expert Medical Opinions**

An expert must have sufficient medical qualifications in order to testify as to medical questions. *See Berry v. McDermid Transportation, Inc.*, 2005 WL 2147946 at *3 (S.D. Ind. 2005) (excluding family therapist from testifying as to post-traumatic stress disorder because she lacked medical degree, the testimony fell out of her area of expertise, and did not have the training and credentials needed to offer reliable testimony); *see also U.S. v. Caroni*, 2011 WL 4102331 (N.D. Fla. 2011) ("while [expert] is an expert in the field of pharmacology, he is not a medical doctor and is thus not qualified to testify whether a given prescription was written for a legitimate medical purpose[.]").[1] This is especially true where the expert "lacks a medical degree…[and] does not have the professional training and credentials needed to offer reliable testimony." *See Berry v. McDermid Transportation, Inc.*, 2005 WL 2147946 at *3.

Ms. Esnayra holds a Bachelor of Arts in Philosophy and a Ph.D. in Biology. *See* Esnayra at 35-36. She leads an organization, which she founded, that is a certification registry for service dogs and advocates on behalf of people with dog access issues. *See* Esnayra at 22-23. She has written non-peer review (non-scholarly) articles individually, and in conjunction with lawyers regarding access service dogs. *See* Esnayra at 65.

Ms. Esnayra, however, has absolutely no qualifications that would enable her to evaluate and treat a patient or discuss the scientific basis for emotional support animals. Specifically:

- She has no medical licenses[2]
- She holds no professional license or certification of any kind

---

[1] *See also Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997) (affirming exclusion of opinion by toxicologist who was not a licensed physician as to causation of plaintiff's condition).
[2] *See* Section 458.305, Florida Statutes ("'Physician' means a person who is licensed to practice medicine in this state" and "'Practice of medicine' means the diagnosis, treatment, operation, or prescription for any human disease, pain, injury, deformity, or other physical or mental condition.")

- She is not a medical doctor
- She is not a psychologist
- She is not a social worker
- She is not a therapist
- She is not a Nurse
- She is not a Veterinarian
- She is not an animal behavioralist
- She is not any kind of medical professional.
- She has never published any peer review literature on service dogs, therapy dogs, or emotional support animals
- She has never done any peer review studies on service dogs, therapy dogs, or emotional support animals
- She has never published any peer review literature on Alzheimer's disease or Dementia
- She has never done any peer review research literature on Alzheimer's disease or Dementia

Ms. Ensyara testified that she believes that she is qualified to render mental health treatment for patients based upon what she describes and "peer support." *See* Esnayra at 53-54. More specifically, Ms. Ensyara, according to her own testimony, suffers from psychological disabilities that that she analogizes to Ms. Falin's dementia. *See* Esnayra at 54. By this logic a member of Alcoholics Anonymous is an expert on the complex medical causes and treatments of alcoholism and addiction.

Because scientific testimony does not assist the trier of fact unless it has a justified scientific relation to the facts, the Eleventh Circuit has held that "there is no fit where a large analytical leap must be made between the facts and the opinion." *See Evans v. Matrixx Initiatives, Inc.*, 2009 WL 2914252 (M.D. Fla. 2009), *citing McDowell v. Brown,* 392 F.3d 1283, 1289 (11th Cir.2004); *see also Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512 (1997) (finding too great an analytical gap between data suggesting that one type of cancer was caused in mice and the conclusion or opinion that such data established causation of another type of cancer in humans).

As Ms. Esnayra is not a doctor, or a medical professional, she should not be permitted to opine as to medical issues. Indeed, a biologist is not qualified to render medical opinions. *In re TMI Litig. Cases Consol. II*, 911 F. Supp. 775, 809 (M.D. Pa. 1996) *aff'd sub nom. In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) *amended*, 199 F.3d 158 (3d Cir. 2000) (biologist not qualified to give medical opinion).

**C. The Expert Testimony**

An examination of Ms. Esnayra's report reveals the medical nature of the testimony she intends to render. She seeks to opine that Ms. Falin's pet "qualifies" as an emotion support dog. *See* **Exhibit C** at p. 8. She opines on medical impairment, stating that: "[s]ymptoms of DAT [Alzheimer's disease] were manifest on camera. For example…]" *Id*. at 9. She seeks to give opinions on whether the pet improves Ms. Falin's medical condition by discussing "how Ms. Falin fares without the dog" and that, in the presence of the pet, Ms. Falin is "back to her normal self." *Id*.

She also sets forth long pseudo-scientific explanations to support her medical conclusions. For example she states:

> When a human gazes into a dog's eyes and pets the dog for a minimum of three minutes, oxytocin, a prosocial 'connectedness hormone' increases. The fact that this phenomenon occurs in patients with Dementia of the Alzheimer's Type regardless of disease stage is a testament to pre-cognitive autonomic endocrine response that is inherent to all vertebrates. Thus, in the case of DAT patients it is likely that the patient will continue to derive 'emotional support' from a dog, even in late state disease progression when the patient can no longer communicate with humans.

*See* **Exhibit C** at p. 5. This is exactly the type of junk testimony that the Court is charged with excluding, as it is extremely dangerous and prejudicial. "[A]n expert's methodology must be consistent with the 'methods and procedures of science' rather than being founded on 'subjective

7

belief or unsupported speculation.'" *In re Accutane Products Liability*, 511 F. Supp. 2d 1288, 1290-91 (M.D. Fla. 2007) (physician's testimony excluded because it was not supported by sufficiently reliable data (such as animal studies) to be admissible).[3]

To a lay juror, the above quote sounds highly scientific and well founded. In fact, it is complete nonsense. There is no acceptance by medical professionals of the four step syllogism set forth above. And, even if there were, Ms. Esnayra would not be qualified to render testimony in this area. *See* p. 4, *supra*.

Also, Ms. Esnayra's proffered opinion ignores the facts of the case. Indeed, Ms. Falin is taking several medications to treat her Alzheimer's. *See* Esnayra at p. 90. Ms. Esnayra admitted that she was unable, and unqualified, to describe the pharmacological action of any of these compounds and how they affect an Alzheimer's patient's brain. *See* Esnayra at p. 90-91. She is equally unqualified to discuss how the alleged release of oxytocin would effect Alzheimer's disease. This is particularly true in the context of the cocktail of other medications Ms. Falin is taking.

Also, Ms. Esnayra's proffered opinion ignores the fact that Ms. Falin has had her pet for almost ten years, and that the pet lives with her in her home, rather than in a clinical context. Expert analysis that discusses only the evidence the expert believes will advance the plaintiff's position, and ignores a large amount of information that calls the expert's theory into question, cannot be considered reliable. *Ranes v. Adams Laboratories, Inc.*, 778 N.W.2d 677, 696-97 (Iowa 2010). Further, subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for

---

[3] Also, "[w]hen an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study … [t]hat is, he must not draw overreaching conclusions." *Id*. at 1291.

8

rejection of expert testimony. *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1136 (E.D.N.Y. 2006).

Indeed, the question at issue in this case is whether Ms. Falin's pet is needed to ameliorate the effects of Ms. Falin's disability. Ms. Esnayra, however, testified that scientific literature on the effect of a pet dog in a dementia patient's home, did not strike her as relevant to the question at issue. *See* Esnayra at p. 110.

Moreover, Ms. Esnayra did not even consider the temporal relationship between the onset of Ms. Falin's dementia and when she received the pet dog. Ms. Falin has had the dog for nearly 10 years, but Ms. Esnayra had no idea when Ms. Falin was first diagnosed with dementia. How could a medical professional properly consider whether this is an effective and legitimate treatment – verses a complete fraud – without knowing this critical fact.

In sum, Ms. Esnayra's proposed opinions are not reliable, and are not grounded in science or the facts of the case. As such, she should be stricken as a witness in this matter.

**D. Motion to Compel – Ms. Esnayra's Willful Failure to Answer Deposition Questions**

Because she is utterly unqualified in this field, Ms. Esnayra was repeatedly and deliberately evasive during her deposition when posed with relatively simple questions. For example, Ms. Esnayra was asked to identify peer review studies "that examine the effects of a pet dog on patients with dementia who are living at home." *See* Esnayra at p. 94. She identified two published papers that she produced in response to La Mer's subpoena – neither of which is a study of pet ownership in the home context. *See* Esnayra at p. 99. Ms. Esnayra further stated that there might be additional studies regarding this subject. *See* Esnayra at p. 100. She repeatedly refused to answer a simply question as to whether she produced any of these documents:

9

> Q. Right. I want to know where the literature is that shows that -- that studies the effect of a pet as an emotional service animal in the context of a patient's home. Where is the study on that?
>
> A. I didn't specifically look for that literature. I was more focused on kind of the condition as opposed to the environment.
>
> Q. So you didn't even consider whether that literature existed, when you were preparing your report?
>
> A. No, I know that it exists, but I didn't feel that it was the most salient, given the questions that I needed to answer.
>
> Q. Well, in your report you say, quote, few studies exist that examine the effect of a pet dog on patients with dementia who are living at home.
>
> A. Yes.

*See* Esnayra at p. 99 -100.

> Q. My question is: You say few studies exist. What are they?
>
> A. I cannot recapitulate them right now. I know exactly where to find that information. Compared to the number of studies involving therapy dogs in Alzheimer's patients, you know, there are fewer that focus on pets in the home.

*See* Esnayra at p. 100.

> Q. … My question is: Are you relying upon any literature that addresses whether it's beneficial to a person with dementia living at home?
>
> A. The reason why I focused a lot on the therapy dog literature with Alzheimer's patients is because the way those studies are done are much more controlled. And I think those data are -- are stronger than the kinds of methods you can use when you're, you know, monitoring someone in their home.
>
> So from my perspective, you get better science by looking at the therapy dog literature.
>
> Q, I appreciate that, but it's not -- I don't think that you answered my question, which is, if there -- if there -- are you relying on any literature, is there any literature in that regard that you can identify for us?

MR. DIETZ: Objection, asked and answered.

THE WITNESS: Well, I -- I did name the two papers that pertain to, you know, pets and people with Alzheimer's.

Q. And those are not in the con -- those are in a clinical context, correct?

A. Well, I mean, how do you define a clinical context?

Q. Outside of, not in the person's home.

A. So does that mean that clinical care provided in the home is not happening in a clinical context, when it is clinical care being provided?

My point is that, whether it's in a hospital or someone's home, matters less than the methodology used. It's just less important that -- you know, there are studies done in homes versus clinics.

And like I said, the therapy dog literature has better science. It is more controlled. Most of it is controlled in some kind of institutional setting,but I mean –

Q. ... I'm just asking you, quite frankly, whether you have any literature like that, that you're relying upon? And when I say like that, I mean literature examining the effects of a pet dog on patients with dementia who are living at home?
...
THE WITNESS: Okay. Could you repeat the question?

*See* Esnayra at p. 100-104.

Q. Okay. So you have given us all of the literature that you're relying upon, correct?

A. Well, yes and no.

My body of knowledge, my training as a scientist is predicated on thousands of research papers that I've read as part of my training and maintenance of the training, so it's actually impossible to give you every paper that substantiates my thinking on this because it's too numerous to count. So I had to make a --

**...**

Q. One of the things you haven't given us is these additional studies that you're discussing, that you contend examine the effects of a pet dog on patients with dementia who are living at home?

A. No, I think I made reference to human/animal bond studies that pertain to pets that may or may not include people with Alzheimer's. And I did not feel that that collection of literature was relevant to the questions I was being asked to respond to.

Q. Okay. And you did not produce that literature, correct?

A. Well, I did produce two papers that I've already reported here. And they are about pets and they are about Alzheimer's patients, so I would have to disagree with your statement.

Q. Well, this other literature that you're referring to, I don't know what it is because I don't have any names of authors or anything like that, but this other literature that you're referring to, other than these two papers that we have already discussed at length, you haven't produced those, correct?

A. I produced what was asked of me in a -- in a very practical kind of way, because I can't produce 10,000 research papers that I've read over the last 25 years.

Q. Okay. Well, in addition to the two papers that you produced, that you say -- that you contend examine the effects of pet dogs on patients with dementia who are living at home, you have indicated that there are other papers that you're aware of, is that accurate?

A. No, that's not what I indicated. What I said was there is a body of research that looks at pets in the home on the effects on people that live in that home. And that literature may or may not include Alzheimer's patients specifically. That was not the focus of my way of responding to the questions I was given and, therefore, that's why those papers, you know, are not things that we are talking about per se. It's just your way of thinking about it and my way of thinking about it are just different.

Q. And that body of literature, whatever it is, was not produced to us, correct?

A. I provided you with what I believe was most salient, given the questions.

> Q. Is there some reason why you can't answer my question, as to whether you produced the literature that you're referring to, this body of literature that you didn't feel was salient, or whatever reason you didn't produce it? Is there some reason why you won't answer and say that you didn't produce it?
>
> A. I guess I'm waiting for you to ask me if I produced any literature on sex determination in fruit flies. I mean, you know, this is kind of out of left field. I answered it the way I answered it for the reasons that I did. And I've stated that numerous times.
>
> Q. Okay. So would it be fair to say that you don't feel that this other literature that we are discussing is germane to this case?
>
> A. I feel that the literature that I did use is more germane, especially scientifically, and that's why I chose it.
>
> Q. Okay. And the other literature you did not produce to us, period? Correct?
>
> A. Which literature are you talking about?
>
> Q. The body of literature that examines the effects of a pet -- the effect of a pet dog in a patient's home that may or may not concern dementia patients, that you were discussing a moment ago?
>
> A. And what is it about that literature that you're asking me?
>
> Q. I'm asking you whether you produced it or not?
>
> A. Didn't strike me that it was relevant to the question.

*See* Esnayra at p. 105-110.

At that point counsel adjourned the deposition for the purpose of filing this motion. Ms. Esnayra's evasive and incomplete answers rendered it impossible to properly examine her opinions. Understanding what documents and support for Ms. Esnayra's opinions have and have not been produced, and a complete discussion of the alleged scientific basis for Ms. Esnayra's opinions are critical. Accordingly, that should the Court permit Ms. Esnayra to testify, the

13

Defendants request that the Court compel Ms. Esnayra to directly answer questions regarding the existence and production of literature which she contends support her opinions.

WHEREFORE the Defendants, Condominium Association of La Mer Estates, Inc. and Kevin Rathvon respectfully move the Court to strike Ms. Esnayra as a witness in this case, or alternatively, compel her to answer questions related to the literature upon which she bases her opinions.

**CERTIFICATE OF GOOD FAITH CONFERENCE; CONFERRED
BUT UNABLE TO RESOLVE ISSUES PRESENTED IN THE MOTION**

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve this issues but has been unable to resolve the issues.

Respectfully submitted:

**DAMIAN & VALORI LLP**
*Counsel for Defendants*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

By: s/ Peter F. Valori
Peter F. Valori, LLC
Florida Bar No. 043516
Russell Landy, Esq.
Florida Bar No. 0044417

Eric Glazer, Esq.
Florida Bar No.: 946494
GLAZER & ASSOCIATES, P.A.
*Counsel for Defendants*
One Emerald Place
3113 Stirling Road, Suite 201
Hollywood, Florida 33312
Telephone: (954) 983-1112
Facsimile: (954) 333-3983

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on February 23, 2012 upon all counsel or parties of record on the attached service list.

s/Peter F. Valori
*Counsel for Defendants*

## SERVICE LIST

Matthew W. Deitz, Esq.
matthewdietz@usdisabilitylaw.com
Matthew W. Deitz, P.L.
2990 SW 35th Avenue
Miami, Florida 33133
Telephone No.: (305) 669-2822
Facsimile No.: (305) 442-4181